Okay, Mr. Allen, we'd be pleased to hear from you. Thank you, your honors, and thank you for having me this morning. I represent plaintiff and appellant Mahmoud Saqqa. I'd like to reserve three minutes of time for rebuttal. The first place that I believe the district court's analysis went astray is by failing to follow one of the fundamental rules of summary judgment analysis, which is that all justifiable inferences from the facts must be drawn in Mr. Saqqa's favor as the non-moving party. And specifically, an undisputed fact from which the court made inferences in the defendant's favor is this idea that Mr. Balaji, who's the head of the department and the hiring manager, had the authority to just place Mr. Vora in this position. The defense argued that below and argues on appeal as well, and the court adopted that construction of the facts. There's an inference that's implicit in the court's decision that since Mr. Balaji didn't just place Mr. Vora in the position, there was no discrimination, sort of an underlying assumption that if Mr. Balaji has a discriminatory motive, he's going to act on that motive. Well, that was maybe one line in the court's decision, but there was more to it. I mean, where's the evidence of the race discrimination? Where's the evidence that you've come forward with to show an inference that your client did not get this promotion on account of his race? Well, there are two things I would say. First, as this court's precedent and Supreme Court precedent notes, quoting from the Snead decision at the defense sites, a disparate treatment plaintiff can survive summary judgment without producing any evidence of discrimination beyond that constituting her prima facie case, if that evidence raises a genuine issue of material fact regarding the truth of the employer's proffered reasons. And we rely on our prima facie case and the pretext evidence to infer discrimination from Mr. Balaji's actions here. And in addition to that, there's some evidence from both Mr. Saka and Mr. Mendoza, who also worked there, of Mr. Balaji's treatment in the workplace of Asians versus non-Asians. Just their observations from going about work on a day-to-day way. But the evidence that to me is more persuasive is what Mr. Balaji did with this promotional process, which was unprecedented. It was contrary to both Mr. Balaji's prior practice and contrary to practice at this agency for him to take control of this hiring panel, insert himself on the panel for a position that did not report to him, and his positions taken during the panel were inconsistent with his history. So Mr. Balaji initially... So counsel, so yeah, so I mean, I think this is actually getting at, you know, you're saying that you don't want to have us apply the fourth factor under, you know, the fourth factor where you look at differential treatment because you don't think it fits here. But at the end of the day, you would agree that you have to have some prima facie evidence of some sort of discrimination based on race, right, for your first claim? Yes. Okay. I thought you would. So I guess we'll jump to where I think I'm struggling, which is at the end of the day, if it's going to be prima facie evidence, this is actually one, I don't know if you'll agree with this, but do you agree that you have to show that racial motivation is more likely than some other motivation? Assuming we don't go with the fourth factor, but we would replace it with something else. I think that whatever that else would be, we would have to, you'd have to at least, you would have to at least be able to show that race was a more likely explanation than, than whatever other, you know, benign explanation might be out there. Would you agree with that? Or do you think that if race is just one of many equally plausible explanations, that's enough for you to over, to meet your first, your requirements under McDonnell Douglas? No, I would agree with your Honor's statement. At the end of the day, our burden is... Okay. Okay. Well, let me, let me, let me, because I'm sorry, but I'm trying to get to where I'm really struggling, which is, so you were just explaining about how, you know, these, these actions that Balaji, I think his name was taking and how, you know, they, I think what I'm hearing from you is that it could be consistent with a race motivation. And I mean, I don't know what's in his head, right? So I don't, that maybe that's true, but what I'm struggling with is that it's more consistent with a race explanation. So for instance, the meeting example you were just giving to go to what you were just talking about, the meeting example, the fact that he injected himself into this process, I mean, it seems to me like it's just as plausible that he wanted to be involved in the process because he cared very much about these two new positions that had turned into one position. And he wanted to make sure that was filled with the right person. And why isn't that not just as plausible? I'm not saying it's more plausible, but why is that not just as plausible for the reason why he injected himself in that process as, as wanting to, to discriminate based on race? Well, I believe that we have to look at that particular fact in light of the overall factual pattern. So if we turn to the panel discussion that took place, once Mr. Balaji inserted himself onto the panel, he initially advocated that Mr. Vora should be selected and the other three panel members didn't agree with him. And he then changed his position to say that neither candidate is qualified, therefore nobody is getting this promotion. And he took that position, not withstanding the fact that he had earlier advocated for everyone in this job classification to have their position upgraded to ESM and the human resources department wouldn't go along with that. And so then the plan became to have these two new ESM positions. And it was understood that those would be Mr. Balaji and Mr. Vora and the human resources department wouldn't go along with that. And so it was only after this promotion was reduced to a single position that Mr. Balaji involved himself in the way that he did to steer that promotion to his fellow Asian. And I think that those circumstances inform all of what took place here. But it was not steered to him. Nobody got it. Well, correct. And that comes back to the district court's point that Mr. Balaji could have placed Mr. Vora in that position. But the thing that the district court didn't discuss and the inference that I believe should be drawn in Mr. Saka's favor is that to have done so would have had potentially significant negative consequences for Mr. Balaji. First of all, there would be the just plain weirdness of it that one out of four panel members is causing this candidate to be placed in the position. Certainly runs the risk of creating some appearance of favoritism in favor of Mr. Vora. Certainly runs the risk of creating conflict with his fellow panel members, which include two of the three deputy directors of the department. So there are significant incentives for Mr. Balaji to not simply override the wishes of the other three panel members and place Mr. Vora in that position, notwithstanding the fact that he had the authority to do so. What about what happened afterwards when your client met with Balaji and Balaji indicated he was trying to help him along through this process in so many words? Yes. How do we infer discrimination through that? Well, at the end of the day, Mr. Balaji did not promote Mr. Saka. And towards the end or at the end of that process of meeting with Mr. Saka when Mr. Saka had complied with these various things that Mr. Balaji was telling him to do, Mr. Selling, who was Mr. Saka's direct supervisor and Mr. Balaji's direct report, Mr. Selling has a meeting with Mr. Balaji to discuss what's going on with Mr. Saka and his promotion. And Mr. Balaji acknowledges that he's just moving the goalposts. Mr. Selling's takeaway from that conversation was that Mr. Balaji was never going to promote Mr. Saka, and Mr. Selling informed Mr. Saka of that. Counsel, my concern about the case, on the race aspect of the case, is that normally in these race discrimination cases of this type, you'll find some objective evidence of racial animus, and added to that are the various inferences that you've been arguing about. I found no objective evidence here of any claim of bias, but only a case based on inferences. Am I wrong in my perception? Not entirely. What I would say is that what I refer to as direct evidence of racial animus is slight. Fair enough. I'll take your correction. I think it's a good one. What is the slight evidence? I didn't see any evidence. So tell me about the slight. Mr. Saka's observation and also the observation of a co-worker, Mr. Mendoza, of Mr. Balaji's general demeanor in the workplace when turned towards his fellow Asians versus non-Asians, and their observation was that they have seen him engage in hostile work environment type behavior with non-Asians and never with Asians. All right. What do you mean by this? What specifically are you referring to in the record on this point? Yes, the declaration of Mahmoud Saka and the declaration of David Mendoza are the evidence in the record. And that evidence consists of what? In meetings, Mr. Balaji was more short or curt with non-Asians? Rather than more short or more curt, they both describe affirmatively harassing type behavior, berating, belittling. Well, that was with respect to age. I'll spot you that with respect to age, talking about old people. But I think our questions are about race. Both, I'm sorry, both Mr. Saka and Mr. Mendoza speak to this issue in terms of race. Their observations of Mr. Balaji's treatment of Asians versus non-Asians in the workplace. Thank you. I would say also that Mr. Balaji's more favorable treatment of Mr. Vora in this selection process is a direct evidence of Mr. Balaji favoring an Asian over a Caucasian employee. Well, as Judge Beebe points out, I don't think that there was any showing of that. Nobody was hired. Let me get to that. So you keep, I understand that that's your position. But in some ways, even crediting the concept that in this, after the interviews that Mr. Balaji, which I think we have to, Mr. Balaji wanted to hire, initially wanted to hire Vora, right? That's what you're getting at. He initially wanted to hire Vora. But he ultimately didn't hire Vora. And you are speculating as much as we would be as to why he didn't want to. You don't know why he didn't. I don't think there's any testimony about why he didn't. But your position is he wanted to hire Vora, and then he didn't hire Vora. How is that any different than SAKWA? Because SAKWA, we have multiple instances where it originally he did when he thought there was going to be two, you're saying. And then later on, after Vora dropped out, he did. But then he didn't. So it seems to me like even as to that, they're very similarly situated. There was evidence in the record to indicate he wanted to promote, not hire, but promote both of them, and evidence that he ultimately didn't promote either of them. Yes, thank you, Your Honor. The difference is that much of what we talked about is history. At the end of the day, there came only a single promotional opportunity, and that's the one following the panel discussion. Do you want to save some time for rebuttal? Yes, please. Thank you. Thank you, Mr. Allen. Mr. Norton. Good morning, Your Honor. May it please the Court. My name is David Norton. I represent the County of San Joaquin and Chris Bellagio. I want to take some time to respond to some of the issues that were brought up by opposing counsel at the outset of the argument. I'll also address some of the questions that were raised, happy to answer any other questions that you may have. I'll start off with the race discrimination claim, which was discussed by opposing counsel. The district court granted summary adjudication on this claim because there simply is no evidence to support it. It can be characterized as direct evidence, circumstantial evidence, slight evidence, and inference. It doesn't matter because there is no evidence in the record to demonstrate that Chris Bellagio discriminated against Mahmoud Saka because he is Caucasian, and that is what his claim ultimately is based on. Now, what the claim is essentially, the theory is that because Chris Bellagio, in a post-interview discussion, made comments favorable towards another Asian candidate, because of that, therefore, when Mahmoud Saka was not promoted to the position, it was because that Mahmoud Saka was not Asian. And it's the evidence that supports the therefore part of that sentence which is entirely lacking in this case. What we know from the evidence is, of course, that Chris Bellagio wanted to promote Mahmoud Saka at the outset. He created a position for him. He interviewed him. He interviewed him for the trailblazers position as well. After he was denied the promotion, he continued to meet with him for months on end. The plaintiff admitted that Chris Bellagio was genuine when he met with him during those meetings and actually wanted to see him succeed. There's no evidence in this case of any racial comments, nothing racially discriminatory at all from Chris Bellagio. And I want to address one of the questions raised by Judge Van Dyke, which is, why does it have to be race involved in the reason why that he was not selected? And that's a great question because there is no evidence that it was race. It could have very well been the shoes that he was wearing when he went to the interview. There is nothing in the record to suggest that the reason he was not selected for that position is race. So, counsel? Well, isn't the county in a stronger position, better off from a litigation point of view, to assert the reason as being qualifications, that somebody's more qualified? Do you benefit from no reasons being stated? Well, the plaintiff's burden is to demonstrate that it was a legal discrimination. Chris Bellagio could have chosen not to hire or promote Mahmoud Saka for no reason at all, and it would not have been illegal. And the reason why it's been stated in the record, which is he did not, Chris Bellagio did not believe that either candidate demonstrated the leadership capabilities or set forth that information in the interview to convince him to promote them to the position. Is that consistent with his position at the beginning, which is he wanted both of these gentlemen to have this promotion? Yeah, he wanted, I think initially, what the plaintiff has alleged and is undisputed for purposes of summary judgment is that Chris Bellagio advocated for him to have this position. And as time went on, he then went to the interview. There's still an interview process. The evidence in the record demonstrates Chris Bellagio was a little unsure about creating this position. He didn't want to just fill the position for the sake of filling it. He wanted to make sure that the person that was going into that position was qualified and would do a good job. Is that why he asked them to participate in this trailblazer program? That's part of the reason why. That's why he wanted to sit in on the interview panel, because he was concerned with what Mike Selling was going to do, who's the hiring manager, who wanted to potentially just fill a position for the sake of filling it. So he sat in on the interview. But on that point, I do want to also raise, with respect to the treatment of the non-Asians versus the Asians, which I think is what ultimately the evidence that supports the race discrimination is. I mean, that is effectively the only race-related reason that has been set forth in this case by the plaintiff. And the actual evidence that supports that is very flimsy. If you look at the record of what this evidence is, what the plaintiff has said is, well, he has not harassed non-Asians, and therefore, when he harassed me, it was because I was Asian. Of course, there's no race harassment claim. So we then have to take it to, when he harassed me, that's evidence that he didn't promote me because of my race. There are several causational dots that need to be met here before the plaintiff actually gets to this point. But the bigger issue is that the evidence that he did not harass non-Asians is based entirely on lack of foundation, speculation, declarations from David Mendoza. What David Mendoza actually says in his declaration is, I never saw Chris Bellagy harass anyone that was of the same race or religion as he was. There's nothing in there that says that he knows the race or that it was actually related to race or religion. He doesn't specify that. And there's no evidence set forth by the plaintiff as to how many Asians there are even in the department. That goes to a lot of the issues with the evidence that supports the race discrimination claim, which is that it's sort of incomplete. Right? For example, we have the issue with the, you know, if he says that, well, he sat in on this interview panel and he never did that before. Well, that may be a relevant fact. It may not be. The plaintiff has not set forth evidence. There's nothing in the record to show that it would be a relevant fact. And as an example of that, if there were 20 ESM interviews that Chris Bellagy had taken part of, and he never sat in on any of these interview panels, perhaps it would be relevant that he sat in on this one. But there's no evidence that he ever sat in on any panel because there's no evidence of any other ESM recruitment in the record. So it's an incomplete fact to say that it's unprecedented that he sat in on this panel. And even if you were to agree with that, there the racial assertion to its elements. Is the argument here, as you understand it, that the plaintiff was discriminated against because he was Caucasian? That would be the argument that plaintiff would need to succeed on. Is that the argument that he makes? No, not at all, Your Honor. He focuses on the fact that he was discriminated against because he was not Asian, not because he was Caucasian, right? And so that is sort of, when you get to the end of this process, when Feruz Rohra retires, there's only one candidate left, there's only one qualified candidate, it's the plaintiff, right? So at that point, there's no reason for Chris Bellagy to continue to favor an Asian person. But there's no evidence to demonstrate that he ever discriminated against a Caucasian, because that's essentially what he did at that point, is when he did not choose him to be he therefore must have discriminated against the plaintiff because he is Caucasian, having nothing to do with the Asian race. So if there's none of the other questions about the race claim, I will move on to the age harassment claim, which was not addressed, but I just want to address it briefly before my time is up. Now, the court, the district court granted summary adjudication on this claim as well, because the decisional law demands that it be dismissed. When we analyze FIHA harassment claims in California, the primary way that we do that, or the courts do that rather, is we look at the other decisional law over the past decades of experience that we have in these claims, and we compare them with other cases. How many comments were made in this case? What type of, how severe was it in that case? What did the court do in that case? And what we did in our briefs is we set forth those types of cases. Well, there's no direct evidence of animus as such, unless you take these several comments about age in a stereo, that were made apparently in a stereotypical fashion. Oh, there are too many old people around here. What do we do with those? That's pretty direct evidence about age, if not discrimination, at least age bias. Well, the claim is a little bit different under a harassment claim. We're no longer dealing with biases or discrimination. We're dealing with a hostile work environment. Right. Severe or pervasive harassment. Yeah, well, sure. I mean, I'm 80, for example. The panel could say, oh, there's too many old judges around here. We need young judges. Right. Is that a hostile work environment? As a matter of fact. I might consider it hostile. Right, Your Honor. I mean, is that a fair summary? The courts have held consistently, as a matter of law, that comment alone would not consist to be, that would not amount to a hostile work environment, because it's not severe or pervasive enough to be considered a hostile work environment. And your claim should be dismissed at the summary judgment stage. That is what we have in this case. We have three comments, all of which are, we have two of which are fairly innocuous comments, one of which was characterized as a joke. The other one is a simple reference to the age of managers. And then the third comment, which is alleged to be in an angry tone where he says, old managers like you need to retire. So we look at the decisional law on these sorts of scenarios. What is the context of this case? We don't have any physical assault. There's nothing in here that would even suggest that the terms and conditions of his employment were altered in any way. We have a single comment, really, that is forming the basis of this claim. And perhaps the plaintiff knows that, because what he's trying to do in this case is take all of these other things that happened to him, these other instances of non-protected category harassment, which is basically just what we have as a mean boss case, where Chris Bellagio is being hard on his employee about his performance. And the plaintiff is characterizing that as harassment and trying to lump it in with his age claim. But the problem with that is that none of that conduct was directed at him because of his age. And I know that's true, because I asked the plaintiff about his deposition, and he told me that it wasn't. And that is the best... Is that in the record? Yes, Your Honor. And I believe that's in the briefing as well, where I asked the plaintiff, did you believe that any of this conduct was directed at you because of your age? And he unequivocally and unqualified said, no, it was not. And so all we have then is these comments... I think his argument now is that, you know, that's what I believed back then, but now I think it was because of my age, right? That's his response to that. Right. He testified that I asked him, did you believe that it was because of your age? And he said, no. Now, the plaintiffs in the district court level said, well, that was in the past tense, and maybe he does now believe that it was because of his age. There's no evidence to suggest that, of course, other than sort of what's in the briefing. Assuming all that's true, which I think we obviously have to... So assuming that he didn't believe then based on the deposition, but he believes now, well, how does that factor into how we analyze this claim? I guess, do we say, well, it must not have been super persuasive... pervasive. It must not have been super pervasive if he didn't perceive it at the time? Is that kind of your point? Well, I have two responses to that. The number one thing would be that the plaintiff would be contradicting his own deposition testimony, which the court can reject at the summary judgment. No, no, no. I don't think he's... I mean, his argument now, he understands he said that. His argument is, I didn't think that at the time, but now in hindsight, I see it more clearly that it was age motivated by age. So assuming that's the case, which I think it is, how does that factor into how we analyze this? Well, it would go to whether or not it affected the terms and conditions of his employment, because with the time that he was there, which is when he was employed, he testified that it did not affect the terms and conditions of his employment based on age. Yeah, would it be... I mean, I guess what I'm getting at, would it be possible to have a pervasively harassing environment based on a certain characteristic, but the person not be aware of it at the time? Yeah. Theoretically, there could be a case where that happens. And those types of cases, and some of the decisional law talks about it, when, for example, if there was evidence in this case that Chris Bellagi treated other people over the age of 40 in the same manner, then there would be evidence to demonstrate that the way that he's treating Mahmoud Saqqa might be because of his age. And then the harassment could be connected to age, because there's some sort of pattern or practice of Chris Bellagi. There's really nothing in this case to demonstrate that Chris Bellagi engaged in these, what I would call routine work performance meetings with Mahmoud Saqqa, where voices were raised. There's nothing to suggest that it had anything to do with age, for the same reason it could be that he didn't like the shoes that he was wearing. There's nothing at all to demonstrate that it would be age harassment or connected to age. If there's any other, if there's no other questions, rather, I would submit that the district court should uphold the, my apologies, this court should affirm the district court's ruling in granting the summary judgment motion in favor of the respondents. Thank you. Thank you, Mr. Norton. Mr. Allen. Thank you, Your Honor. Speaking briefly to Mr. Saqqa's statement as a deposition, I understand it the way the justice articulated it. What I would point to is, to the extent that the defense wants to say, therefore, Mr. Saqqa never had any belief that this was age discrimination. In the record is a letter that Mr. Saqqa sent to the board of the time he retired, in which he references Mr. Balaji's various explicit age-related statements, and also talks about Mr. Balaji being on a campaign to get rid of older managers. As far as the decisional law, the Cornell case that we cited, D versus Vintage Petroleum, these cases tell us that the explicit status-based hostile work environment facts provide a basis to infer that other hostile conduct in the workplace is based on that same protected characteristic. And as the court pointed out in another context, it is the defense who have the best ability to articulate why they did what they did, and their failure to articulate anything substantial here gives rise to the pretext argument that both United States and Ninth to permit the trier of fact to infer discrimination. Ultimately, that's a call for the jury to make. And with that, I'll submit. Thank you, Allen. Mr. Allen, and I want to thank both counsel for their helpful briefing and arguments. This matter is submitted.
judges: Lucero, BRESS, VANDYKE